# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00636-CV

**American Electric Power Company, Inc. and
TXU Electric Company, Appellants**

**v.**

**Public Utility Commission of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. GN103613, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

American Electric Power Company, Inc., and TXU Electric Company ("appellants")
appeal from a district court judgment affirming a final order of the Public Utility Commission ("the
Commission").[1] We will reverse the agency order and the district court judgment and remand the
controversy to the Commission.

## THE CONTROVERSY

To secure adequate and continuous service to the public, an electric utility was in the
past given a monopolistic franchise with corresponding public duties and an opportunity to earn

---

[1] American Electric Power Company, Inc., is a utility holding company and the parent
corporation of three electric utilities whose annual revenues and annual costs are disputed in the
present appeal: Central Power and Light Company, West Texas Utilities Company, and
Southwestern Electric Power Company. All are included in our references to "appellants."

revenues sufficient to recoup its reasonable and necessary expenses and pay a reasonable return to those who had invested their capital in the enterprise. The Commission for many years regulated the particulars of this arrangement under the ratemaking provisions of the Public Utility Regulatory Act ("PURA").[2]

The Commission calculated an electric utility's rates under PURA sections 36.051-.064 and fixed its overall revenues at an amount that permitted the utility a reasonable opportunity to recover its "reasonable and necessary operating expenses" together with "a reasonable return on [its] *invested capital* used and useful in providing service to the public." PURA § 36.051 (emphasis added). The term "invested capital" is not made the subject of a specific definition in PURA although the term is said to be synonymous with the term "rate base," *see* 16 Tex. Admin. Code § 25.231(c)(2) (2003); and, the "components" of invested capital are described broadly as "property used by and useful to the utility in providing service," appraised based on original cost less depreciation. PURA § 36.053(a). In fixing an electric utility's rates, the Commission exercised a statutory authority to separate and allocate "[c]osts of facilities, revenues, expenses, taxes, and reserves" in arriving at rates that were just and reasonable. *Id*. § 36.055.

By amendments to PURA in 1999, the legislature opened to competition major elements of electric-utility operations previously regulated in the manner indicated. Among other things, the 1999 amendments provided that in the interim before January 1, 2002, an electric utility's

---

[2] Tex. Util. Code Ann. §§ 11.001-64.158 (West 1998 & Supp. 2003). In the text of our opinion hereafter, we will cite to the statutory provisions as "PURA §_____."

rates, fixed previously by the Commission as described in the preceding paragraph, would remain frozen; and, for each of the calendar years 1999, 2000, and 2001, electric utilities were required to file with the Commission an annual report in a format prescribed by the agency. The purpose of the report is to identify any excess ("positive difference") of "adjusted annual revenues" over and above the utility's adjusted "annual costs." *See* PURA § 39.257(a), (b). The consequences attending any such excess depend upon whether the reporting utility claimed "stranded costs" resulting from previous Commission regulation. "Stranded costs" refers to costs incurred by a utility as a result of investments, made under the previous regulatory regime, that would not be recoverable in the new competitive marketplace. If a utility claims such stranded costs, PURA requires that the excess of "adjusted annual revenues" over and above adjusted "annual costs" be applied against the net book value of the utility's generation assets; if a utility does not claim stranded costs, PURA requires that the utility refund the excess to its customers or apply it to improve the utility's transmission and distribution facilities or add pollution-control equipment. *See id*. §§ 39.254, 39.255.

The 1999 amendments prescribe the calculations required to be included in the annual report in order to identify any excess of annual revenue over annual costs. First, revenues for the calendar year must be adjusted by deducting therefrom revenues derived from certain specified sources; these include sums received by the utility as a result of any Commission adjustment of the reporting utility's fixed-fuel factor and a subsequent reconciliation as contemplated in PURA section 36.203. *See id*. § 39.257(b). Second, the 1999 amendments provide for various adjustments of a utility's calendar-year costs in arriving at its "annual costs." *See id*. § 39.258(1)-(8). Among these are costs resulting from such Commission adjustments of the utility's fixed-fuel cost and a

subsequent reconciliation. *See id*. §§ 39.258(1)(A)(i), (1)(B)(i). And under the rubric "Determination of Annual Costs" the 1999 amendments include a provision for fixing the utility's return on invested capital. *See id*. § 39.258(7). Any excess of revenues over costs, resulting from these calculations, constitutes the "positive difference" or excess mentioned in the preceding paragraph, which must be applied in the manner there indicated.

In making the calculations and adjustments laid down in PURA sections 39.257 and 39.258, it profits the utility to maximize its annual costs while minimizing its calendar-year revenues; doing so reduces the amount of any excess that must be applied for the purposes specified in PURA sections 39.254 and 39.255 while enlarging the amount retained by the utility for operating and other costs of service. In the present controversy, the parties' respective contentions center around what the pertinent statutory provisions require in reporting the utilities' calendar-year revenues and annual costs associated with the Commission's *expected* adjustment of their fixed-fuel factor and an attendant reconciliation under PURA section 36.203.

As indicated above, any revenue attributable to such adjustment and reconciliation must be deducted from the utility's calendar-year revenues and a corresponding offset is required for any resulting costs. *See id*. §§ 39.257(b), 39.258(1)(A)(i), 39.258(1)(B)(i). The evident reason for excluding revenues resulting from such adjustment and reconciliation is this: such revenues are not recovered by and through the utility's frozen rates. Rather, the utility receives such revenues outside those rates and through the Commission's independent actions in adjusting the utility's fixed-fuel factor and ordering a reconciliation under PURA section 36.203. The resulting revenues represent the difference between a utility's actual fuel expenditures and its predicted or hypothetical fuel costs

4

based on the fixed-fuel factor embedded in its frozen rates. *See Nucor Steel v. Public Util. Comm'n*, 26 S.W.3d 742, 745 (Tex. App.—Austin 2001, pet. denied); *City of El Paso v. El Paso Elec. Co.*, 851 S.W.2d 896, 897-98 (Tex. App.—Austin 1993, writ denied).

A utility's fuel expenditures have several accounting consequences bearing on the present controversy. Fluctuating fuel prices may cause the utility to pay more for fuel than it recovers through its fixed-fuel rate. We may say with the parties that the utility "under-recovers" its fuel costs, for the time being, in such cases. The excess of the utility's actual fuel costs over and above its hypothetical cost of fuel measured by its fixed-fuel factor constitutes an intangible asset owned by the utility; it is equivalent to an interest-bearing account receivable that will become due and payable by the utility's customers when the utility's fixed-fuel factor is next adjusted by the Commission and a reconciliation ordered under PURA section 36.203, at which time the utility is authorized to add a surcharge to its customers' bills to recover the amount owed together with accrued interest; interest accrues on the receivable, however, at a rate much lower than the utility's rate of return. *See* PURA § 39.259(a). The receivable is extinguished, of course, as customers pay the surcharge included in their bills.

A utility's under-recovery of fuel costs may create other accounts on its books. One such account is in controversy here. Until the utility receives reimbursement for the under-recovery, it may include on its books a record of its expected liability for federal income tax on the revenue it anticipates receiving at some future date when the Commission authorizes the inclusion of a surcharge in customer bills. Until that event occurs, however, and payment of the surcharges is actually received, the utility's federal income-tax liability is said to be "deferred" or not yet due and

5

payable. While the liability remains in a deferred status, it may be included in an account denominated "Accumulated Deferred Income Taxes" or "ADIT." The ADIT account is not restricted to sums resulting from an anticipated tax liability associated with a prospective fuel-factor adjustment and reconciliation; it may also include sums reflecting an anticipated income-tax liability resulting from other transactions. For convenience, however, we will sometimes refer to ADIT hereafter as meaning only that segment of ADIT resulting from an anticipated fuel-cost adjustment and reconciliation.

PURA section 39.259 provides for the determination of invested capital in the required annual reports. Among other things, the statute directs that both "regulatory assets, and deferred federal income taxes shall be updated each year" before calculating the utility's invested capital for purposes of the annual report. PURA § 39.259(a). In general, "regulatory assets" enlarge invested capital while "deferred federal income taxes" reduce invested capital. And because a utility's *return* on invested capital is an annual-cost item, a utility's annual costs increase or decrease with a corresponding movement of invested capital. *See id*. § 39.258(7).

In their annual reports for calendar year 2000, appellants excluded from their invested capital the balance in both their under-recovered fuel-cost account and the corresponding part of their ADIT account. Commission staff and the Office of Public Utility Counsel objected to appellants' exclusion of ADIT from invested capital. The Commission sustained their objection and in a final order signed September 13, 2000, directed appellants to revise their annual reports to include in their invested-capital calculation a deduction equal to the amount of ADIT attributable to a future fuel-

6

factor adjustment and reconciliation. In appellants' suit for judicial review, the district court affirmed the Commission order and this appeal ensued.

## DISCUSSION AND HOLDINGS

PURA section 39.259(a) provides as follows:

(a) For the purposes of determining *invested capital* in each annual report, the net plant in service, *regulatory assets*, and *deferred federal income taxes* shall be updated each year, and generation-related invested capital shall be reduced by the amount of securitization under Sections 39.201(i) and 39.262(c) to the extent otherwise included in invested capital.

PURA § 39.259(a) (emphasis added). Implicit in the statutory command is this proposition: "regulatory assets, and deferred federal income taxes shall be updated each year" for a specific purpose, namely "determining invested capital in each annual report."

"The definition and identification of invested capital . . . shall be treated in accordance with generally accepted accounting principles as modified by regulatory accounting rules generally applicable to utilities." *Id*. § 39.260(a). That is to say, the Commission's discretion is circumscribed to the extent indicated and the agency must act within those principles and rules in a determination of invested capital under PURA section 35.259.

If we understand correctly the Commission's brief on appeal, it argues in support of its inclusion of ADIT, as a deduction from invested capital, on two ultimate or controlling grounds: (1) PURA section 39.259(a), by directing an annual update of deferred federal income taxes "without limitation" (meaning without exception), indicates a legislative intention that "[*a*]*ll* deferred taxes," or the total amount of a utility's ADIT account, must be included as an offset to invested capital,

7

including that part of ADIT attributable to a future fuel-cost adjustment and reconciliation; and, (2) that part of the ADIT account attributable to fuel-cost under-recovery "is not a fuel cost or revenue recovered in the fuel-factor/fuel reconciliation process [but] is, instead, cash realized from the infusion of cost-free capital as a result of the deferral of income tax expense."

We reject the first argument. PURA section 39.259(a) similarly sets forth no exception from the required inclusion of "regulatory assets" in the annual update, yet it is evident that the Commission properly excluded from regulatory assets the balance found in the appellants' under-recovered fuel-cost account: the exclusion was necessary to give effect to the required adjustment for annual revenues under PURA section 36.203. *See* PURA § 39.257(b). The Commission, like this court, was required to interpret each of the pertinent statutory provisions in context and not in isolation, so as to give effect to all of them. *See Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex. 1985). The same must be said of the annual-cost aspect of PURA section 36.203 incorporated in PURA sections 39.258(1)(A)(i) and 39.258(1)(B)(i).

The Commission's second argument requires more extended comment. In a regulatory-accounting context, ADIT is indeed treated ordinarily as an offset to invested capital or rate base because "[i]n essence, the utility is gaining a cost-free 'loan' from ratepayers between the time in which it collects the taxes and the eventual payment of the taxes to the IRS." *In re Investigation into the Existing Rates of Vt. Tel. Co.*, 739 A.2d 671, 673 (Vt. 1999). This broadly stated principle carries certain corollary accounting distinctions, however, and one of them is applicable here.

Accumulated deferred income taxes (ADIT) are deducted from the rate base as cost-free funds available for investment. The rate base deduction for ADIT is based on the assumption that the recorded income tax deferrals represent the *collection* of amounts from ratepayers equal to the deferred tax reserves. However, the *recording* of deferred income taxes does *not* produce cost-free capital (just as the recording of depreciation expense does not recover plant costs). *The funds do not become available until the customers pay their bills*.

Robert H. Hahn & Gregory E. Aiff, *Accounting for Public Utilities*, § 5.04(4), at 5-24 (2001) (emphasis added).

That part of a utility's ADIT account attributable to fuel-cost *under*-recoveries represents merely the *recording* of a prospective liability for federal income tax. That tax liability will not actually arise until the utility's "customers pay their bills" containing a surcharge authorized by the Commission following a fuel-factor adjustment and fuel-cost reconciliation under PURA section 36.203. Until such payments are actually collected, it may not reasonably be said that the utility's ADIT account represents a cost-free loan subsidized by the utility's customers. By definition then, an *under*-recovered fuel-cost item in the ADIT account does not meet that criterion although a fuel-cost *over*-recovery presumably would if reflected in the ADIT account. The latter issue is not before us in the present appeal. We therefore reject the Commission's second contention.

For the reasons given, we hold the Commission order arbitrarily required appellants to include in their invested-capital calculation a deduction or off-set in the amount of their ADIT account attributable to fuel-cost under-recovery. We therefore reverse the order and the district court

9

judgment affirming it, remanding the controversy to the Commission for proceedings not inconsistent with our opinion.  *See* Tex. R. App. P. 43.2(c), (d).


_____

John E. Powers, Justice

Before Chief Justice Law, Justices Puryear and Powers[*]

Reversed and Remanded

Filed:   August 29, 2003

---

[*]   Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Govt. Code Ann. § 74.003(b) (West 1998).