OPINION
 

 LESLIE BROCK YATES, Justice.
 

 Appellant National Union Fire Insurance Company of Pittsburgh, PA (“National Union”), an excess insurance carrier, sued appellees, who represented National Union’s insured, Granada Food Corporation (“Granada”), in an underlying lawsuit. As an equitable subrogee of Granada, National Union alleged that Keck, Mahin & Cate (“KMC”) and one of its attorneys, Robert Plessala, committed legal malpractice in their defense of Granada in the underlying lawsuit. The jury returned a verdict for KMC and Plessala, and the trial court entered a final take-nothing judgment against National Union. We affirm.
 

 Factual and Procedural Background
 

 This is not the first time this litigation has been before this court. In 1997, we were faced with, among other things, the issue of whether summary judgment was proper for KMC.
 
 See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am.,
 
 955 S.W.2d 120 (Tex.App.-Houston [14th Dist.] 1997),
 
 aff'd sub nom. Keck, Mahin & Cate v. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa.,
 
 20 S.W.3d 692 (Tex.2000). Our opinion was affirmed by the Texas Supreme Court, and although we need not discuss all aspects of either opinion in detail here, we borrow liberally from both opinions to summarize the underlying lawsuit and National Union’s claims in this subrogation lawsuit.
 

 In September of 1991, Wolf Point Shrimp and its owner (collectively “Wolf Point”) sued Granada for damages allegedly caused by Granada’s improper processing and marketing of shrimp grown and harvested by Wolf Point the previous fall. Granada hired KMC as its attorneys in the lawsuit, and KMC tendered the defense of the lawsuit to Granada’s primary insurance
 
 *704
 
 carrier, Insurance Company of North America (“INA”), and Granada’s excess insurance carrier, National Union. INA’s primary policy provided a limit of $1 million per occurrence. National Union’s commercial umbrella policy provided an additional $9 million in excess coverage.
 

 INA agreed to defend Granada under a reservation of right to contest coverage, and Granada elected to keep KMC as its counsel. INA formally engaged KMC to defend Granada in the Wolf Point litigation, and Plessala was assigned primary responsibility for the defense. During the course of the litigation, Wolf Point demanded $3.6 million to settle the lawsuit. INA and National Union were both informed of the demand, but neither insurer expressed interest in settling for that amount. Plessala advised that the case could probably be settled at that time for less than half this sum.
 

 In January of 1992, the trial court gave the Wolf Point lawsuit a preferential trial setting for April 28, 1992. Plessala’s efforts to continue the trial setting were unsuccessful, and the case proceeded to trial. On the first day of trial, INA tendered its policy limits to National Union. Two days later, National Union settled the lawsuit for $7 million, and a final judgment was later signed for that amount.
 

 National Union filed its lawsuit against INA, KMC, and Plessala to recover some of the money it paid to settle the Wolf Point lawsuit. Under the doctrine of equitable subrogation, National Union asserted claims, including negligence, against INA and a legal malpractice claim against KMC and Plessala. INA asserted a cross-claim against KMC and Plessala for malpractice and asserted the affirmative defenses of contributory negligence and comparative responsibility against National Union. KMC and Plessala pleaded the same affirmative defenses against National Union and further pleaded that a release agreement between it and Granada barred National Union and INA’s claims against Plessala and KMC.
 

 All of the parties filed motions for summary judgment. The trial court granted summary judgment for KMC on the two insurers’ subrogation claims for malpractice because of the KMC-Granada release agreement. The trial court also granted partial summary judgment for National Union, rejecting INA and KMC’s affirmative defenses of contributory negligence and comparative responsibility. The trial court granted INA’s motion for partial summary judgment, thereby eliminating National Union’s claims of gross negligence and violations of the Texas Insurance Code. The trial court then severed National Union and INA’s claims against KMC and rendered a final judgment that the two insurers take nothing against KMC. On appeal, the supreme court held that KMC had not met its burden of proving that the release agreement was a complete defense to National Union and INA’s equitable subrogation claims. The court also determined that KMC and INA could raise National Union’s comparative responsibility in defense to the respective negligence claims against them. The court remanded the case for trial, and the jury found that the release executed by KMC and Granada was valid and that the negligence of INA and National Union, rather than the negligence of Plessala (if any), proximately caused the loss to National Union.
 
 [1]
 

 In six issues, National Union argues that (1) the release is invalid as a matter of law because it covers prospective claims and
 
 *705
 
 Granada did not have independent representation, (2) the evidence is legally and factually insufficient to support the jury’s finding that the release is valid, (3) the trial court erred in submitting an improper jury instruction regarding proximate cause, (4) the evidence is factually insufficient to support the jury’s finding that Plessala was not negligent or did not damage National Union, (5) the evidence is legally and factually insufficient to support a finding that National Union was negligent, and (6) the evidence is legally and factually insufficient to support a finding that INA was negligent and caused National Union damages. We conclude the evidence is factually sufficient to support a finding that Plessala was not negligent. We further conclude that the release is not invalid as a matter of law and that there is sufficient evidence to support the jury’s finding that the release is valid. Therefore, we affirm.
 

 Negligence of Plessala
 

 A claim for attorney malpractice in Texas is based on negligence.
 
 Cosgrove v. Chimes,
 
 774 S.W.2d 662, 664 (Tex.1989). The jury must evaluate an attorney’s conduct based on the information available at the time to determine if a reasonably prudent attorney could make the same decision in the same or similar circumstances.
 
 Id.
 
 at 664-65.
 

 In this case, the jury was asked whether Plessala’s negligence, if any, proximately caused National Union’s loss, and the jury answered “no.” In its fourth issue, National Union challenges the factual sufficiency of the evidence to support this answer. In reviewing factual sufficiency, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings.
 
 See Cain v. Bain,
 
 709 S.W.2d 175, 176 (Tex.1986). After considering and weighing all the evidence, we set aside a fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.
 
 See Pool v. Ford Motor Co.,
 
 715 S.W.2d 629, 635 (Tex.1986). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony.
 
 GTE Mobilnet of S. Tex. Ltd. P’ship v. Pascouet,
 
 61 S.W.3d 599, 615-16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We will not substitute our judgment merely because we might reach a different conclusion.
 
 Mar. Overseas Corp. v. Ellis,
 
 971 S.W.2d 402, 407 (Tex.1998);
 
 Pascouet,
 
 61 S.W.3d at 616.
 

 On appeal, National Union contends that Plessala was negligent in five ways, specifically, in failing to (1) depose the individual plaintiff, (2) depose Wolf Point’s experts or otherwise pin down the bases for their opinions, (3) consult with experts to help present Granada’s case on liability and damages, (4) hire local counsel, and (5) pay the jury fee.
 

 National Union presented expert evidence on the negligence issue from Judge David West, a retired district court judge with over fifteen years of experience on the bench. Plessala did not depose Wolf Point’s owner, who was an individual plaintiff in the underlying suit. According to Judge West, this was negligent because the plaintiff needed to be “pinned down” on his allegations, such as how much shrimp was lost. Thirty days before trial, Wolf Point designated an expert on liability regarding Granada’s fault in ruining the shrimp and an expert on damages. Ples-sala neither deposed these witnesses nor requested that their opinions be reduced to writing. As a result, Plessala did not know the experts’ opinions, such as that Wolf Point had lost over $14 million in future profits. Plessala also did not personally consult with any experts to prepare a defense to liability or damages. Wolf Point’s suit was filed in Matagorda County,
 
 *706
 
 which Plessala acknowledged is a “plaintiffs county” based on its high jury verdicts. Wolf Point was represented at trial by two prominent attorneys with connections to the judge, Neil Caldwell. Plessala did not hire local counsel and did not pay the jury fee (which he assumed Wolf Point had paid), both of which could have helped insulate Granada from potential bias. Judge West testified that all of these failures were unreasonable under the circumstances and therefore fell below the standard of care.
 

 Plessala responded with his own testimony as well as testimony from Tom Eas-ley, the Granada representative in charge of the Wolf Point litigation, and Fred Ha-gans, a legal malpractice expert who has been practicing law over thirty years. Plessala explained that he and Easley concluded early on that Granada had no real liability defense. Wolf Point had deposed one of Granada’s former employees, who testified to several facts that would have made challenging liability extremely difficult. After Plessala shared this testimony with Easley, Easley contacted the general manager of a shrimp farm in Panama affiliated with Granada for advice, who also expressed concern over Granada’s potential liability. Though National Union hired an expert in the malpractice trial that said Granada was not negligent, Plessala thought it unwise to attempt to find a similar outside expert because he believed that would have challenged the veracity of his own client. Therefore, Plessala decided the best strategy was to essentially concede liability and focus on containing damages. Most of the items of damages, such as the value of the shrimp, were well established, but Plessala was particularly concerned about limiting Wolf Point’s claim for lost profits, which Plessala believed to be invalid as a matter of law. He chose not to depose the individual plaintiff because Plessala had very detailed information on Wolf Point’s allegations from discovery responses and from a settlement brochure sent by Wolf Point’s attorneys. He also thought deposing the plaintiff would only make the plaintiff a better witness, and Plessala feared damages questions would have revealed his case strategy. Plessala did not depose Wolf Point’s liability expert because Granada was not contesting liability, and he did not think it was necessary to depose the damages expert because Plessala believed he knew what his testimony would be based on the settlement brochure. Plessala also chose not to hire a damages expert because his lost profits argument was primarily legal and he thought he could establish the facts he needed through cross-examination of Wolf Point’s damages expert and the individual plaintiff. Finally, Plessala testified that he did not hire local counsel because he did not think he needed it and that he was “happy” to try the case to the judge rather than a jury because he believed that would help contain damages.
 

 Hagans testified that he believed Plessa-la not only met but exceeded the standard of care under the circumstances. He discussed each criticism of Plessala’s conduct and explained why, in his opinion, each decision was reasonable. For example, Hagans testified, and Judge West agreed on cross-examination, that whether to take a plaintiffs deposition (or any witness’s deposition) is a case-by-case judgment call. Here, Plessala had detailed information on Wolf Point’s allegations from the settlement brochure, which was the most detailed settlement brochure Hagans had ever seen and, according to Hagans, provided better information than most written discovery responses or depositions. Ha-gans took offense at National Union’s implication that it was impossible to get a fair trial in Matagorda County in front of Judge Caldwell and stated that not hiring local counsel was a reasonable decision. Hagans believed Plessala’s case strategy
 
 *707
 
 to focus only on containing damages was reasonable under the circumstances and that his decisions in carrying out that strategy, such as not deposing Wolf Point’s experts and not hiring his own experts, were also reasonable.
 

 Easley testified that he was aware of Plessala’s overall strategy of not contesting liability and agreed with it. Based on the information in the depositions and Easley’s discussion with the general manager of the shrimp farm in Panama, Eas-ley concluded that Wolf Point’s shrimp were most likely ruined by Granada’s processing. Easley was completely satisfied with Plessala’s representation in the Wolf Point matter, and Granada refused National Union’s request to join it in a malpractice action against KMC and Plessala.
 

 National Union argues that the jury’s finding that the release between Granada and KMC and Plessala is valid effectively “gutted” its malpractice claim by preventing the jury from considering all of Plessala’s conduct. The release covered all claims attributable to services rendered from June 1, 1988 through April 1, 1992, and the jury was therefore instructed “not [to] consider any conduct by [Plessala] that occurred on or before April 1, 1992.” National Union fails to delineate which of the five categories of alleged negligence it believes the jury could and could not have properly considered under this instruction.
 
 [2]
 
 Nevertheless, even considering the full range of conduct National Union claims was negligent, we find the evidence factually sufficient to support a finding that Plessala was not negligent. Viewing the entire record, we do not find the overwhelming weight of the evidence is against the jury’s finding. Indeed, there was plenty of evidence from which the jury could have determined that Plessala was not negligent. Therefore, we overrule National Union’s fourth issue.
 

 Because there is some risk the jury could have decided not to consider some of Plessala’s conduct in attempting to follow the trial court’s instructions once it found the release to be valid, we will address National Union’s first and second issues regarding the validity of the release. However, given our conclusion that sufficient evidence supports a finding that Ples-sala was not negligent, we need not address National Union’s remaining issues.
 
 [3]
 

 Validity of the Release
 

 KMC and Granada entered into a release on April 10, 1992, about three weeks before the Wolf Point trial was scheduled to begin. Granada owed KMC over $880,000 in unpaid legal fees for matters other than Wolf Point, and in exchange for KMC’s promise to forgive these unpaid fees, Granada gave KMC an interest in certain other pending litigation KMC was handling and released KMC from “any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly
 
 *708
 
 attributable to the rendition [of] professional legal services by KMC to Granada between June 1, 1988 and April 1, 1992.” The release also contains a provision stating that “KMC has advised Granada in writing that independent representation is appropriate in connection with the execution of this Agreement.” However, Granada did not seek independent representation because it thought the release was in its interest and therefore considered consulting an attorney unnecessary.
 

 In KMC’s original motion for summary judgment, it argued that since National Union stood in Granada’s shoes as subrogee, the release between KMC and Granada barred National Union’s claims. National Union argued that the agreement was invalid because Granada did not understand the agreement and was not fully informed prior to signing the release. When the supreme court reviewed this matter, it explained that contracts negotiated during the existence of an attorney-client relationship are closely scrutinized and, because of the fiduciary nature of the relationship, there is a presumption of invalidity or unfairness attaching to such contracts.
 
 Keck,
 
 20 S.W.3d at 699. To rebut this presumption, KMC must prove that (1) the release was “fair and reasonable” and (2) “Granada was informed of all material facts relating to the release.”
 
 Id.
 
 The record established only that Granada was advised in writing to seek independent counsel, but this “bare recitation” was inadequate to carry KMC’s summary judgment burden, therefore necessitating a trial.
 
 Id.
 

 In its first issue, National Union contends the release is invalid as a matter of law because it covers prospective claims
 
 [4]
 
 and Granada did not have independent legal representation, in violation of Rule 1.08(g) of the Texas Disciplinary Rules of Professional Conduct. In its second issue, National Union asserts that the evidence is legally and factually insufficient to support the jury’s finding that the release is valid.
 

 Is the release invalid as a matter of law?
 

 Rule 1.08(g) of the Disciplinary Rules provides:
 

 A lawyer shall not make an agreement prospectively limiting the lawyer’s liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement, or settle a claim for such liability with an unrepresented client or former client with out first advising the person in writing that independent representation is appropriate in connection therewith.
 

 Tex. Disciplinaey R. PROf’l Conduct 1.08(g),
 
 reprinted in
 
 Tex. Gov’t Code Ann., tit. 2, subtit. G app. A (Vernon 1998).
 
 *709
 
 National Union contends the release is invalid as a matter of law because KMC violated Rule 1.08(g) by entering into a release with its client that covered prospective claims when the client did not first secure independent representation. KMC argues that the release covers only past conduct and therefore that legal representation was not necessary. We agree that the release is prospective, but we conclude that it is not invalid as a matter of law.
 

 The question we must first resolve is whether a release of future claims based on past conduct is prospective. National Union contends the release is prospective because it forgives claims that had not yet accrued. KMC responds that the release is not prospective because it disposes only of past conduct not future conduct. While it is true the release covers past conduct, the disciplinary rule does not speak in terms of conduct. Rather, it speaks in terms of liability. We find the release between KMC and Granada is an agreement to prospectively limit KMC’s malpractice liability because it seeks to limit liability that had not yet accrued.
 
 See Am. Elec. Power Co. v. Pub. Util. Comm’n of Tex.,
 
 123 S.W.3d 33, 38 (Tex.App.-Austin 2003, no pet.) (noting that the part of a utility’s account attributable to fuel-cost under-recoveries “represents merely the recording of a prospective liability” that will not actually arise until the customers pay their bills).
 

 Notably, a legal-malpractice claim does not accrue until “facts have come into existence that authorize a [client] to seek a judicial remedy.”
 
 Apex Towing Co. v. Tolin,
 
 41 S.W.3d 118, 120 (Tex.2001). This means a legal-malpractice claim does not arise “until the client discovers or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of a cause of action.”
 
 Id.
 
 at 121. Because damages are an element of the legal-malpractice claim, the claim does not accrue until the client discovers — or should have discovered — it was legally injured.
 
 Vacek Group, Inc. v. Clark,
 
 95 S.W.3d 439, 443 n. 2 (Tex.App.-Houston [1st Dist.] 2002, no pet.). In fact, a cause of action may not accrue until well after facts alluding to the malpractice have surfaced.
 
 See Tate v. Goins, Underkofler, Crawford & Langdon,
 
 24 S.W.3d 627, 636 (Tex.App.-Dallas 2000, pet. denied) (finding cause of action did not accrue when client learned of potential claim during deposition but only after default judgment was entered against the client);
 
 Estate of Arlitt v. Paterson,
 
 995 S.W.2d 713, 720 (Tex.App.-San Antonio 1999, pet. denied) (dismissing claim made by deceased appellant’s estate for estate planning malpractice because no claim for legal malpractice could have accrued prior to appellant’s death).
 

 Here, the release is broad and covers “all demands, claims or causes of action of any kind whatsoever ... now existing or that might arise hereafter.” The release disposes of all claims against KMC for malpractice attributable to legal services rendered from June 1, 1988 to April 1, 1992 in return for Granada’s release of “all present and
 
 future
 
 claims” attributable to KMC’s work during that same period.
 
 Keck,
 
 20 S.W.3d at 698 (emphasis added). Crucially, any claims relating to the Wolf Point litigation had not accrued by the time the parties signed the release agreement because Granada had not yet suffered any injury from the alleged malpractice. No actual injury was manifested until, during settlement negotiations, it became apparent that actions or omissions of KMC may have significantly increased the settlement value of the case. We find this release, although it concerns past conduct, was an attempt by KMC to dispose of malpractice liability from causes of action that had not yet accrued. By doing
 
 *710
 
 so, KMC prospectively limited its potential liability, and since Granada did not have independent representation, KMC violated Rule 1.08(g).
 

 However, a violation of Rule 1.08(g) does not automatically render the release invalid. The supreme court determined that the presumption of unfairness attached to the release in this case because it was negotiated during the attorney-client relationship.
 
 Keck,
 
 20 S.W.3d at 699 n. 3. “Conversely, had Granada severed the attorney-client relationship with KMC and hired new attorneys before agreeing to the release, the presumption would not have arisen.”
 
 Id.
 
 Thus, the supreme court determined that the consequence of violating Rule 1.08(g) was not to invalidate the release as a matter of law but to require KMC to overcome the presumption by proving the release is fair and reasonable and that it informed Granada of all material facts.
 
 See id.
 
 Because violating Rule 1.08(g) does not invalidate the release as a matter of law, we overrule National Union’s first issue.
 

 Is the evidence sufficient to support a finding that the release is valid?
 

 In accordance with the supreme court’s opinion, the trial court instructed the jury that to find the release valid, “(1) the release agreement must have been fair and reasonable; and (2) [Granada] must have been informed of all material facts relating to the release agreement.” The jury determined the release is valid. In its second issue, National Union challenges both the legal and factual sufficiency of the evidence to support the jury’s finding.
 

 A legal sufficiency review differs from the factual sufficiency review we outlined above in that in considering legal sufficiency, we view the evidence in a light that tends to support the disputed findings and disregard all evidence and inferences to the contrary.
 
 See Lee Lewis Constr., Inc. v. Harrison, 70
 
 S.W.3d 778, 782 (Tex.2001). If more than a scintilla of evidence exists, it is legally sufficient.
 
 Id.
 
 More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about a vital fact’s existence.
 
 Id.
 
 at 782-83.
 

 National Union first argues that the evidence is insufficient to establish that the release was fair and reasonable because the agreement was not supported by adequate consideration. Adequacy of consideration is one factor in assessing the fairness of a transaction involving a fiduciary.
 
 See Estate of Townes v. Townes,
 
 867 S.W.2d 414, 417 (Tex.App.-Houston [14th Dist.] 1993, writ denied). National Union claims that since Granada could not pay its legal bills, what KMC gave up in the agreement — the right to seek payment on uncollectible bills — was of no value. However, the evidence did not conclusively establish that Granada would never be able to pay even a portion of its legal bills. Granada was experiencing severe financial difficulties and was attempting to resolve outstanding liabilities from many creditors to avoid bankruptcy. Nevertheless, KMC had the right to attempt to collect what it was owed, even through the bankruptcy process if necessary. Granada approached KMC about a plan to forgive its existing debt while maintaining their attorney-client relationship in exchange for giving KMC an interest in other litigation KMC was handling. KMC agreed, so long as Granada agreed to a release of legal-malpractice claims. KMC advised Granada several times, both orally and in writing, to seek independent representation, but Granada refused. Tom Easley, Granada’s representative in charge of the Wolf Point litigation, testified that Granada did not believe it needed legal advice because the agreement was “very favorable” and “ab
 
 *711
 
 solutely in [Granada’s] best interest” by providing substantial debt forgiveness and allowing Granada to continue to receive KMC’s services on Wolf Point and other matters. Easley was not concerned about releasing any malpractice claims because Granada had always been satisfied with KMC’s representation, and Granada did not believe it had any malpractice claims against KMC.
 
 [5]
 
 The jury was entitled to conclude that forgiveness of over $880,000 in debt, which eliminated a significant liability from Granada’s books, and the ability to retain KMC’s legal services, showed that the transaction was fail' and reasonable to Granada.
 

 National Union also contends the evidence is insufficient to show that KMC informed Granada of all material facts relating to the release. National Union primarily points to the same litany of conduct it claims constituted negligence by Plessa-la, such as failing to depose the individual plaintiff or hire experts.
 
 [6]
 
 Based on the evidence in the record discussed above, the jury could have determined that those items were not material for the same reasons it could have determined they did not constitute negligence. Further, National Union ignores all the evidence in the record of what Granada
 
 did
 
 know, including the unfavorable deposition testimony of its former employee, the unfavorable opinion of the internal expert Easley consulted, Plessala’s strategy to focus on damages rather than liability, and Plessala’s decision not to consult outside experts.
 

 Based on our review of the evidence in the entire record and of only the evidence supporting the jury’s finding, we conclude the evidence is legally and factually sufficient upon which to base a finding that the release is valid. Therefore, we overrule National Union’s second issue.
 

 We affirm the trial court’s judgment.
 

 [1]
 

 . National Union and INA settled their claims before trial, and INA is not a party to this appeal.
 

 [2]
 

 . National Union presented testimony from Judge West that each of Plessala's failures occurred both before and after April 1, 1992. For example, Judge West testified that Plessa-la could have deposed the plaintiff after April 1 and even up until a week before trial, which started on April 28, 1992.
 

 [3]
 

 . In its third issue, National Union asserts error in the trial court’s jury instruction on proximate cause. Because we have concluded that the evidence is sufficient to support a finding that Plessala was not negligent, an error in the proximate cause instruction, if any, was harmless. We also need not address National Union's fifth and sixth issues challenging the jury’s findings that INA and National Union were negligent because the carriers’ comparative or contributory negligence is irrelevant in light of our determination that sufficient evidence supports a finding that Plessala was not negligent.
 

 [4]
 

 . KMC contends National Union waived this issue by not seeking or securing a ruling from the trial court that the release is prospective. However, National Union attacked the jury’s finding in its motion for new trial, arguing that the release is prospective and that, because independent counsel did not represent Granada when it entered into the agreement, the evidence was legally and factually insufficient to support the jury's verdict. Thus, National Union did not waive this argument on appeal.
 
 See Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.,
 
 987 S.W.2d 50, 52 (Tex.1998) ("The court of appeals erred in holding that the no-evidence point in [appellant’s] motion to disregard jury findings did not preserve the contention that no implied warranty arose under the circumstances of this case. [Appellant's] complaint on appeal is that no evidence supports the finding that it violated the DTPA. That complaint encompasses the contention that no implied warranty arose under the present facts because, if no implied warranty arose, then evidence that [appellant] failed to perform in a good and workmanlike manner is no evidence that [appellant] committed a deceptive trade practice.”).
 

 [5]
 

 . National Union asserts that whether a transaction is fair and reasonable is an objective test, and since Granada’s opinions are subjective, they are irrelevant. We disagree. Assuming National Union is correct that the test is objective, Easley’s testimony about how Granada valued and benefitted from the transaction is some evidence the jury could have considered in determining whether the release was fair and reasonable.
 

 [6]
 

 . National Union also asserts that KMC failed to disclose all material facts about legal matters other than the Wolf Point lawsuit that are covered by the release. However, nothing in the record suggests that there was anything KMC
 
 should
 
 have disclosed. Rather, the undisputed evidence shows that Granada was satisfied with KMC’s representation on all matters and never believed it had any malpractice claims against KMC.