ACCEPTED
03-14-00735-CV
5515882
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/2/2015 4:16:02 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00735-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/2/2015 4:16:02 PM
JEFFREY D. KYLE
Clerk

ENTERGY TEXAS, INC., *ET AL.*,

**Appellants,**

**v.**

PUBLIC UTILITY COMMISSION OF TEXAS, INC., *ET AL.*,

**Appellees.**


## REPLY BRIEF


Filed by:  Public Utility Commission of Texas


KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for
Civil Litigation

JON NIERMANN
Chief, Environmental Protection
Division

ELIZABETH R. B. STERLING
Assistant Attorney General
State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
512.463.2012
512.457.4616 (fax)

June 2, 2015

**Oral Argument Requested**

# Table of Contents

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Index of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Glossary.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Reply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    In the fuel reconciliation, the Commission properly removed $4 million in fuel expenses incurred to serve wholesale customers from the amount of fuel expenses Entergy should recover from its retail ratepayers.. . . . . . . . . . 4

    B.    The Commission's Order complies with its rules.. . . . . . . . . . . 5

    C.    The Commission's Order resulted in just and reasonable final fuel rates.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    Entergy fails to show that it was harmed by the Commission's Order.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Conclusion and Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**APPENDICES**

16 Tex. Admin. Code § 25.236. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

16 Tex. Admin. Code § 25.237.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

i

# Index of Authorities

**Cases**                                                                                     **Page(s)**

*Entergy Gulf States, Inc. v. Pub. Util. Comm'n,*
    173 S.W.3d 199 (Tex. App.—Austin 2005, pet. denied). . . . . . . . . . .  6


**Statutes**

Tex. Util. Code
    § 11.002. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8
    § 36.203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8


**Rules**

16 Tex. Admin. Code
    §§ 25.01–.508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv
    § 25.236(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii
    § 25.236(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    § 25.236(e)(1)(A) & (C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
    § 25.236(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    § 25.236(e)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 5, 8
    § 25.236(e)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7
    § 25.237(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii, 7

# Glossary

ALJ            Administrative Law Judge

Cities            Cities of Anahuac, Beaumont, Bridge City, Cleveland, Conroe, Dayton, Groves, Houston, Huntsville, Montgomery, Navasota, Nederland, Oak Ridge North, Orange, Pine Forest, Rose City, Pinehurst, Port Arthur, Port Neches, Shenandoah, Silsbee, Sour Lake, Splendora, Vidor, and West Orange, Texas These cities are in the service area of Entergy Texas, Inc. and participated as parties in the rate case at the Commission.

Commission            Public Utility Commission of Texas

Entergy            Entergy Texas, Inc., the utility that asked the Commission to reconcile fuel expenses in this case

ERCOT            Electric Reliability Council of Texas

FERC            Federal Energy Regulatory Commission

Fuel factor            A temporary rate set by the Commission to recover the utility's fuel costs *See* 16 Tex. Admin. Code § 25.237(a)(3).

Fuel reconciliation            After the utility has collected for fuel costs using the fuel factor, it returns to the Commission to reconcile actual fuel costs with amounts recovered under the Fuel Factor. *See* 16 Tex. Admin. Code § 25.236(b).

Line losses            Electricity that the utility generates but is "lost" as it travels along the wires from the generator to the customer (More electricity is generated than is metered where it is used.)

Order            The Commission's order on rehearing that is the subject of this lawsuit (AR, Item 244.)

Reconciliation period    The two-year period from June 1, 2009, through July 31, 2011; the period during which Entergy incurred fuel expenses that were reconciled in this administrative case

Rule    The Commission's electric rules are found at 16 Texas Administrative Code §§ 25.01–508.  In this brief the Commission refers to its rules as Rule 25.____ rather than using the longer citation, *i.e.*, 16 Tex. Admin. Code § 25.236(e)(3) will be referenced as Rule 25.236(e)(3) in the brief.

$4 million    A rounded-up amount used to represent the $3,981,271 of fuel expenses that the concurrent line-loss study revealed was lost delivering electricity to wholesale customers rather than delivering electricity to retail customers during the reconciliation period

# Issues Presented

A utility recovers expenses for fuel used to generate electricity that is lost as it is delivered to the customer. The Commission found that $4 million of fuel expenses that was estimated in the temporary rates (called a fuel factor) to be lost serving retail customers was actually lost serving wholesale customers. Because the Commission only sets rates for retail customers, did it reasonably deduct that $4 million from the costs that Entergy could recover in its final rates (fuel reconciliation) from its retail customers?

**Introduction**

The Commission files this reply to the "Fuel Costs" section of Entergy's Response Brief.

The Commission properly removed nearly $4 million ($3,981,271) from Entergy's recoverable fuel expenses when it reconciled Entergy's fuel costs—when it determined the utility's final fuel rates for retail service provided during the two-year period from June 1, 2009, through July 31, 2011 (reconciliation period). Entergy's concurrent line-loss study revealed that $4 million was spent on fuel for electricity that was lost delivering the electricity to wholesale customers rather than delivering that electricity to retail customers. Thus, it was not part of the actual, retail fuel costs and was properly excluded from final rates.

The fuel reconciliation revealed that estimated line losses of serving retail customers were not the actual line losses of serving retail customers. The difference appeared because, when the Commission approved Entergy's fuel factor that applied during the reconciliation period, it used a line-loss study performed in 1997. A line-loss study estimates the amount of electricity that is lost while delivering it from the generator to the end-user. The cost for generating that lost electricity is billed to customers so that the utility can recover its reasonable and necessary expenses. When

1

the Commission conducted the fuel reconciliation in this case, it used the 2010 line-loss study. That study, performed during the reconciliation period and approved by the Commission in this case (AR, Order, FF 246–247), revealed that $4 million of fuel expenses that were estimated to be lost delivering electricity to retail customers was actually lost delivering electricity to wholesale customers.

## Summary of Reply

Entergy's arguments fail to acknowledge the impact of the jurisdictional separation between the Commission, which sets Entergy's *retail* rates, and the Federal Energy Regulatory Commission (FERC), which sets Entergy's *wholesale* rates, on the line-loss issue in this appeal.

Entergy ignores the conclusions that naturally follow from the jurisdictional separation.

Because FERC sets Entergy's wholesale rates and the Commission sets only its retail rates, the fuel costs that the Commission allows Entergy to recover in final fuel rates are only costs incurred to serve retail customers. Fuel costs incurred to serve wholesale customers cannot be included as reasonable and necessary fuel expenses recovered from retail customers. Thus, the Commission properly excluded the cost of fuel used to generate electricity that was lost (line losses) in order to serve wholesale customers

during the reconciliation period. The Commission reasonably used the Commission-approved line-loss study done during the reconciliation period because it more accurately determines the separation of wholesale fuel costs from retail fuel costs that occurred as a result of line losses during the relevant period.

Because the FERC sets Entergy's wholesale rates and the Commission sets only its retail rates, the classes included in rates set by the Commission include only retail customer classes. Thus, interclass allocations that the Commission makes under Rule 25.236(e)(3) are only among retail classes. But the Commission's decision to separate out fuel expenses incurred to serve wholesale customers affected the total amount of fuel expenses that are reasonably and necessarily recovered through the Commission's rates. The Commission was not allocating those expenses among retail customer classes.

Because FERC sets Entergy's wholesale rates and the Commission sets only its retail rates, recovery of line losses from wholesale customers will be controlled by FERC, not the Commission. Looking only at a Commission-set fuel factor and Commission-determined fuel reconciliation will show nothing about whether Entergy recovered its expenses for fuel used to

generate electricity that was lost (line losses) in order to serve wholesale customers.

## Argument

**A.    In the fuel reconciliation, the Commission properly removed $4 million in fuel expenses incurred to serve wholesale customers from the amount of fuel expenses Entergy should recover from its retail ratepayers.**

The Commission properly reconciled the amount of fuel expenses that retail ratepayers actually owed for service during the reconciliation period because the updated line-loss study revealed that $4 million in expenses for fuel was incurred serving wholesale customers rather than serving retail customers.

As explained in earlier Commission briefing, a utility's fuel expenses are recovered not through base rates, but through a two-step factor-and-reconciliation process. The Commission adopts a temporary rate called a fuel factor that estimates what the utility's fuel expenses will be. But final rates are determined after the expenses were incurred so that the final rate accurately reflects the actual, reasonable and necessary amount the utility incurred in fuel expenses to serve its customers during the reconciliation period. The fuel factor is based on estimated costs, based on estimated usage, and is a temporary rate; the fuel reconciliation is based on actual costs, based on actual usage, and results in an actual rate.

4

There is no expectation that the estimated fuel expenses used to develop the fuel factor will be the same as the actual fuel expenses found in the fuel reconciliation. That is the very reason for the reconciliation. The two-step factor-and-reconciliation process is used precisely because it is expected that the estimated fuel expenses will differ from the actual fuel expenses. Thus, there is nothing exceptional about the Commission's decision that retail ratepayers actually used less electricity during the reconciliation period than estimated. That this difference in usage was revealed by the most current line-loss study is no reason to ignore that less electricity was generated, and therefore less fuel used, to serve retail customers. Expenses incurred to serve wholesale, rather than retail, customers are not reasonable and necessary expenses to include in retail rates.

## B.    The Commission's Order complies with its rules.

Contrary to Entergy's arguments, Rule 25.236(e)(3) does not apply to the Commission's decision that $4 million in wholesale costs should be removed from final retail fuel rates. Expenses to serve wholesale customers are not included in the pot of fuel expenses that the Commission allocates among retail rate classes.

Not only is Rule 25.236(e)(3) about refunds, which Entergy did not request in this case, but more fundamentally, the Commission can only

5

apply that rule to Entergy's retail rate classes. This is necessarily true because the Commission can only set retail rates for Entergy. *See Entergy Gulf States, Inc. v. Pub. Util. Comm'n*, 173 S.W.3d 199, 207 (Tex. App.—Austin 2005, pet. denied) (explaining that FERC regulates the sale of Entergy's sale of electricity at wholesale (citing 16 U.S.C. § 824(b); *Entergy La., Inc. v. Louisiana Pub. Serv. Comm'n*, 539 U.S. 39, 41, 156 L.Ed.2d 34 (2003)). The Commission cannot order refunds or assess surcharges against Entergy's wholesale customers because the Commission has no jurisdiction to set Entergy's wholesale rates—only its retail rates.[1] Thus, the Commission's decision that $4 million in fuel costs were incurred to serve wholesale rather than retail customers is unaffected by a rule that addresses Entergy's interclass allocations only among *retail* classes.

None of the other rules Entergy cites require the Commission to impose wholesale fuel costs on retail customers.

- Rules 25.236(e)(1)(A) & (C) are about the calculation of interest. That does not impact the Commission's authority as part of the fuel reconciliation to determine that fuel costs incurred to serve wholesale customers are not to be imposed on *retail* customers.

---

[1] Entergy's indication on page 14 of its response brief is thus wrong: Entergy's wholesale customers cannot buy electricity under a Commission tariff.

- Rule 25.236(e)(2). Because the Commission sets *no wholesale* rates, there is no Commission-tariffed rate schedule for wholesale customers that the Commission has authority to adjust.

- Rule 25.236(e)(4) concerns *intra*class allocations. Although it mentions wholesale customers, it can have no application to the Commission's regulation of Entergy because the Commission has no jurisdiction to set wholesale rates for Entergy. Because that utility is outside ERCOT, its wholesale sales are in interstate commerce.

And the rules the Commission cited in its Order do apply.

- Rule 25.236(d)(2). Because the Commission sets only retail rates, it would be *un*reasonable for the Commission to include fuel expenses incurred to serve wholesale customers in the actual, final rates, and any wholesale fuel expenses Entergy recovered from its retail customers through the fuel factor were an *over-recovery* from its retail customers.

- Rule 25.237(a)(3). Because fuel factors are only temporary rates, the Commission can adjust final fuel rates in the reconciliation proceeding to reflect the utility's actual fuel expenses to serve retail customers during the reconciliation period. In the reconciliation, the Commission is free to use a current line-loss study to determine what fuel expenses Entergy actually incurred due to line losses serving its retail customers.

Finally, there is no conflict between these rules and Rule 25.236(e)(3). Because, for Entergy, the Commission only has authority to set retail rates, the Commission-set rates include only retail rate classes. Therefore, the interclass allocations addressed in Rule 25.236(e)(3) apply only to retail rate classes.

## C. The Commission's Order resulted in just and reasonable final fuel rates.

The Commission's Order implements the statutorily prescribed legislative intent. That intent is stated in Section 11.002 of the Utilities Code: "The purpose of this title is to establish a comprehensive and adequate regulatory system for public utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities." The Commission regulates only retail rates for Entergy. And the Legislature, in Section 36.203 of the Utilities Code, authorized the Commission to use a fuel factor—a process where final fuel rates are not determined until a fuel reconciliation is done after the actual expenses are known. The Commission's decision—refusing to allow Entergy to recover fuel expenses incurred to serve wholesale customers from retail customers—fulfills the legislative intent. It is reasonable to consumers and to the utility to require retail customers to pay only for expenses incurred to provide service to retail customers. And the change from the estimated

amount to the actual amount was effected through the two-step fuel-factor-and-reconciliation process authorized by the Legislature.

Entergy's attempts to show the Commission's decision as anything other than reasonable are unavailing.  Entergy's statement:  "Nor did any party challenge the reasonableness or necessity of the fuel costs actually incurred for the reconciliation period," (Entergy Resp. Br. at 4; *see also* at 19) is at best misleading.

While it is true that no party challenged whether the prices Entergy paid for its fuel were too high, Cities challenged the reasonableness of including $4 million of fuel expenses that were actually incurred to serve wholesale customers in fuel rates for only retail customers.  Cities' witness Nalepa stated:  "[Entergy]'s own analysis demonstrates that adjusting the allocation of fuel costs over the reconciliation period to reflect the actual line losses for each voltage level for the reconciliation period results in retail customers subsidizing wholesale customers by approximately $3.98 million." (AR, Cities Ex. 6 at 44, Binder 9.)  And Cities' brief filed at the administrative proceeding states:  "Failing to reflect the actual line losses for the reconciliation period ... would result in Texas retail customers subsidizing wholesale and non-fuel factor customers by $3,981,271." (AR, Item 161 (Cities' Initial Br.) at 86, Binder 4.)  This testimony and argument

show that Cities challenged the reasonableness of including fuel expenses incurred to serve wholesale customers in Entergy's final fuel rates for retail service.

Entergy is also wrong to suggest that the Commission's Order fails to support its decision. Although the Commission's Order could have been stated more clearly, when read as a whole, the Order's finding that Entergy's "fuel reconciliation over-recovery should be reduced by $3,981,271" (Order, FF 246A) reveals that, although Entergy paid reasonable amounts for the fuel it purchased, Entergy over-recovered approximately $4 million in fuel expenses that was incurred to serve wholesale, rather than retail customers.

The findings that Entergy cites, Findings 214 and 217, 218 and 221, and 222 and 225, show that the amounts paid for natural gas expenses, coal expenses, and purchased-energy expenses were reasonable. Although it would have been clearer had the Commission modified those findings when it added Finding 246A, all the findings taken together with the discussion on page nine of the Order explain that the overall amount of retail fuel expenses, modified by removing the $3,981,271 for fuel expenses incurred to serve wholesale customers, is the reasonable and necessary amount. And Conclusion of Law 17 does not include any amount. The amount of

fuel expenses the Commission found reasonable and necessary is the amount that results from all of its findings of fact, including Finding 246A.

The Commission's Order complies with the legislative intent that the Commission use a two-step fuel-factor-and-reconciliation process to develop rates that are reasonable to the consumers and to the utility. The Order is supported by the record and is internally consistent.

## D.   Entergy fails to show that it was harmed by the Commission's Order.

Because FERC, not the Commission, sets wholesale rates, any recovery of line losses from wholesale customers will be controlled by FERC, not the Commission. Thus, looking only at a Commission-set retail fuel factor and Commission-determined retail fuel reconciliation will reveal nothing about whether Entergy recovered its expenses for fuel used to generate electricity that was lost (line losses) serving wholesale customers.

The record in this case contains no evidence about Entergy's FERC-set wholesale rates. Thus, the evidence equally supports a finding that Entergy's wholesale fuel costs were under-recovered or over-recovered.

The testimony Entergy cites to show harm is unavailing. First, Entergy's witness stated: "you're going outside my expertise." (AR Part III, Binder 43, Vol. I (May 1, 2012, Tr. at 1470–410).) And the witness further assumes: "you retroactively change an allocation factor and you don't have

11

the ability to go back and recover those costs from anyone else," but, as explained above, the Commission did not allocate costs to any *wholesale* rate class. Thus, the Commission neither allocates nor adjusts an allocation of those costs to wholesale customers; the Commission only allocates retail costs among retail customers. Moreover, because Entergy provided no information about wholesale rates, which are set by the FERC, the Court cannot know whether Entergy has "the ability to go back and recover those costs from anyone else" or whether the utility already recovered those costs from wholesale customers.

Entergy has not shown that it was harmed.

## Conclusion and Prayer

Entergy's arguments against the Commission's fuel-costs decision fail to appreciate that FERC sets Entergy's wholesale rates and the Commission sets only retail rates. When the Commission determined that $4 million of costs Entergy claimed as fuel expenses to serve retail customers were actually incurred to serve wholesale customers, it reasonably removed that amount from the fuel expenses Entergy could recover from retail customers through the fuel reconciliation.

The Commission asks the Court to issue the judgment that the district court should have issued: one that affirms the Commission's Order on all

12

issues. Thus, the Commission asks the Court to affirm the district court's judgment on the issues raised by Entergy and OPUC, but to reverse the district court's judgment to the extent that it found error in the Commission's Order. The Commission asks the Court for such other relief as it may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

JON NIERMANN
Division Chief
Environmental Protection Division

/s/ *Elizabeth R. B. Sterling*
Elizabeth R. B. Sterling
Assistant Attorney General
Texas State Bar No. 19171100
elizabeth.sterling@texasattorneygeneral.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
512.463.2012
512.457.4616 (fax)

COUNSEL FOR PUBLIC UTILITY
COMMISSION OF TEXAS

**Certificate of Compliance**

I certify that the foregoing computer-generated document has 2,507 words, calculated using the computer program WordPerfect 12, pursuant to Texas Rule of Appellate Procedure 9.4, and that the total number of words for all of the Commission's briefing is 15,905.

<u>/s/ *Elizabeth R. B. Sterling*   </u>
Elizabeth R. B. Sterling

# Certificate of Service

I hereby certify that on this the 2nd day of June 2015, a true and correct copy of the foregoing document was served on the following counsel electronically, through an electronic filing service and by email:

/s/ *Elizabeth R. B. Sterling*
Elizabeth R. B. Sterling

## Counsel for Appellant Entergy Texas, Inc.:

Marnie A. McCormick
Patrick J. Pearsall
Duggins, Wren, Mann & Romero, LLP
P. O. Box 1149
Austin, Texas 78767-1149
512.744.9300
512.744.9399 (fax)
mmccormick@dwmrlaw.com
ppearsall@dwmrlaw.com

## Counsel for Appellants Cities of Anahuac, et al.:

Daniel J. Lawton
The Lawton Law Firm, P.C.
12600 Hill Country Blvd, Ste. R-275
Austin, TX 78738
512.322.0019
855.298.7978 (fax)
dlawton@ecpi.com

**Counsel for Appellant Office of Public Utility Counsel:**

Sara J. Ferris
Senior Assistant Public Counsel
Office of Public Utility
P.O. Box 12397
Austin, Texas 78711-2397
512.936.7500
512.936.7520 (fax)
sara.ferris@opuc.texas.gov

**Counsel for State Agencies:**

Katherine H. Farrell
Assistant Attorney General
Administrative Law Division
Energy Rates Section
Office of the Attorney General
P.O. Box 12548,  MC 018-12
Austin, Texas 78711-2548
512.475.4237
512.320.0167 (fax)
katherine.farrell@texasattorneygeneral.gov

**Counsel for Texas Industrial Energy Consumers:**

Rex VanMiddlesworth
Benjamin Hallmark
Thompson & Knight LLP
98 San Jacinto Blvd., Ste. 1900
Austin, Texas 78701
512.469.6100
512.469.6180 (fax)
rex.vanm@tklaw.com
benjamin.hallmark@tklaw.com

# APPENDIX A

# CHAPTER 25. SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS.

## Subchapter F. METERING.

### §25.236. Recovery of Fuel Costs.

(a)     **Eligible fuel expenses.**  Eligible fuel expenses include expenses properly recorded in the Federal Energy Regulatory Commission Uniform System of Accounts, numbers 501, 502, 503, 509, 518, 536, 547, and 555, as modified in this subsection, as of April 1, 2013, and the items specified in paragraph (8) of this subsection.  Any later amendments to the System of Accounts are not incorporated into this subsection.  Subject to the commission finding special circumstances under paragraph (7) of this subsection, eligible fuel expenses are limited to:

   (1)     For any account, the electric utility may not recover, as part of eligible fuel expense, costs incurred after fuel is delivered to the generating plant site, for example, but not limited to, operation and maintenance expenses at generating plants, costs of maintaining and storing inventories of fuel at the generating plant site, unloading and fuel handling costs at the generating plant, and expenses associated with the disposal of fuel combustion residuals.  Further, the electric utility may not recover maintenance expenses and taxes on rail cars owned or leased by the electric utility, regardless of whether the expenses and taxes are incurred or charged before or after the fuel is delivered to the generating plant site.  The electric utility may not recover an equity return or profit for an affiliate of the electric utility, regardless of whether the affiliate incurs or charges the equity return or profit before or after the fuel is delivered to the generating plant site.  In addition, all affiliate payments must satisfy the Public Utility Regulatory Act (PURA) §36.058.

   (2)     For Accounts 501 and 547, the only eligible fuel expenses are the delivered cost of fuel to the generating plant site excluding fuel brokerage fees.  For Account 501, revenues associated with the disposal of fuel combustion residuals will also be excluded.

   (3)     For Account 502, the only eligible fuel expenses are environmental consumables that are: properly recorded in the Account as chemicals; required to comply with applicable state or federal emission reduction statutes, orders, and regulations; and whose use is directly proportional to the fuel consumed to generate electricity.

   (4)     For Account 509, the only eligible fuel expenses are allowances expensed concurrent with the monthly emissions of sulfur dioxide and nitrogen oxides.

   (5)     For Accounts 518 and 536, the only eligible fuel expenses are the expenses properly recorded in the Account excluding brokerage fees.  For Account 503, the only eligible fuel expenses are the expenses properly recorded in the Account, excluding brokerage fees, return, non-fuel operation and maintenance expenses, depreciation costs and taxes.

   (6)     For Account 555, the electric utility may not recover demand or capacity costs.

   (7)     Upon demonstration that such treatment is justified by special circumstances, an electric utility may recover as eligible fuel expenses fuel or fuel related expenses otherwise excluded in paragraphs (1) - (6) of this subsection.  In determining whether special circumstances exist, the commission shall consider, in addition to other factors developed in the record of the reconciliation proceeding, whether the fuel expense or transaction giving rise to the ineligible fuel expense resulted in, or is reasonably expected to result in, increased reliability of supply or lower fuel expenses than would otherwise be the case, and that such benefits received or expected to be received by ratepayers exceed the costs that ratepayers otherwise would have paid or otherwise would reasonably expect to pay.

   (8)     Eligible fuel expenses shall not be offset by revenues by affiliated companies for the purpose of equalizing or balancing the financial responsibility of differing levels of investment and operation costs associated with transmission assets.  In addition to the expenses designated in paragraphs (1) - (7) of this subsection, unless otherwise specified by the commission, eligible fuel expenses shall be offset by:

      (A)     revenues from steam sales included in Accounts 504 and 456 to the extent expenses incurred to produce that steam are included in Account 503;

    (B)  revenues from off-system sales in their entirety, except as permitted in paragraph (9) of this subsection; and

    (C)  revenues from disposition of allowances properly recorded in Account 411.8.

  (9)  **Shared margins from off-system sales.** An electric utility may retain 10% of the margins from an off-system energy sales transaction if the following criteria are met:

    (A)  the electric utility participates in a transmission region governed by an independent system operator or a functionally equivalent independent organization;

    (B)  a generally-applicable tariff for firm and non-firm transmission service is offered in the transmission region in which the electric utility operates; and

    (C)  the transaction is not found to be to the detriment of its retail customers.

(b)  **Reconciliation of fuel expenses.** Electric utilities shall file petitions for reconciliation on a periodic basis so that any petition for reconciliation shall contain a maximum of three years and a minimum of one year of reconcilable data and will be filed no later than six months after the end of the period to be reconciled.

(c)  **Petitions to reconcile fuel expenses.** In addition to the commission prescribed reconciliation application, a fuel reconciliation petition filed by an electric utility must be accompanied by a summary and supporting testimony that includes the following information:

  (1)  a summary of significant, atypical events that occurred during the reconciliation period that affected the economic dispatch of the electric utility's generating units, including but not limited to transmission line constraints, fuel use or deliverability constraints, unit operational constraints, and system reliability constraints;

  (2)  a general description of typical constraints that limit the economic dispatch of the electric utility's generating units, including but not limited to transmission line constraints, fuel use or deliverability constraints, unit operational constraints, and system reliability constraints;

  (3)  the reasonableness and necessity of the electric utility's eligible fuel expenses and its mix of fuel used during the reconciliation period;

  (4)  a summary table that lists all the fuel cost elements which are covered in the electric utility's fuel cost recovery request, the dollars associated with each item, and where to find the item in the prefiled testimony;

  (5)  tables and graphs which show generation (MWh), capacity factor, fuel cost (cents per kWh and cents per MMBtu), variable cost and heat rate by plant and fuel type, on a monthly basis; and

  (6)  a summary and narrative of the next-day and intra-day surveys of the electricity markets and a comparison of those surveys to the electric utility's marginal generating costs.

(d)  **Fuel reconciliation proceedings.** Burden of proof and scope of proceeding are as follows:

  (1)  In a proceeding to reconcile fuel factor revenues and expenses, an electric utility has the burden of showing that:

    (A)  its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers;

    (B)  if its eligible fuel expenses for the reconciliation period included an item or class of items supplied by an affiliate of the electric utility, the prices charged by the supplying affiliate to the electric utility were reasonable and necessary and no higher than the prices charged by the supplying affiliate to its other affiliates or divisions or to unaffiliated persons or corporations for the same item or class of items; and

    (C)  it has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period.

(2)    The scope of a fuel reconciliation proceeding includes any issue related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period and whether the electric utility has over- or under-recovered its reasonable fuel expenses.

(e)    **Refunds.** All fuel refunds and surcharges shall be made using the following methods.

    (1)    Interest shall be calculated on the cumulative monthly ending under- or over-recovery balance at the rate established annually by the commission for overbilling and underbilling in §25.28 (c) and (d) of this title (relating to Bill Payment and Adjustments). Interest shall be calculated based on principles set out in subparagraphs (A) - (E) of this paragraph.

        (A)    Interest shall be compounded annually by using an effective monthly interest factor.

        (B)    The effective monthly interest factor shall be determined by using the algebraic calculation $x = (1 + i) (1/12) - 1$; where $i$ = commission-approved annual interest rate, and $x$ = effective monthly interest factor.

        (C)    Interest shall accrue monthly. The monthly interest amount shall be calculated by applying the effective monthly interest factor to the previous month's ending cumulative under/over recovery fuel and interest balance.

        (D)    The monthly interest amount shall be added to the cumulative principal and interest under/over recovery balance.

        (E)    Interest shall be calculated through the end of the month of the refund or surcharge.

    (2)    Rate class as used in this subparagraph shall mean all customers taking service under the same tariffed rate schedule, or a group of seasonal agricultural customers as identified by the electric utility.

    (3)    Interclass allocations of refunds and surcharges, including associated interest, shall be developed on a month-by-month basis and shall be based on the historical kilowatt-hour usage of each rate class for each month during the period in which the cumulative under- or over-recovery occurred, adjusted for line losses using the same commission-approved loss factors that were used in the electric utility's applicable fixed or interim fuel factor.

    (4)    Intraclass allocations of refunds and surcharges shall depend on the voltage level at which the customer receives service from the electric utility. Retail customers who receive service at transmission voltage levels, all wholesale customers, and any groups of seasonal agricultural customers as identified by the electric utility shall be given refunds or assessed surcharges based on their individual actual historical usage recorded during each month of the period in which the cumulative under- or over-recovery occurred, adjusted for line losses if necessary. All other customers shall be given refunds or assessed surcharges based on the historical kilowatt-hour usage of their rate class.

    (5)    Unless otherwise ordered by the commission, all refunds shall be made through a one-time bill credit and all surcharges shall be made on a monthly basis over a period not to exceed 12 months through a bill charge. However, refunds may be made by check to municipally-owned electric utility systems if so requested. Retail customers who receive service at transmission voltage levels, all wholesale customers, and any groups of seasonal agricultural customers as identified by the electric utility shall be given a one-time credit or assessed a surcharge made on a monthly basis over a period not to exceed 12 months through a bill charge. All other customers shall be given a credit or assessed a surcharge based on a factor which will be applied to their kilowatt-hour usage over the refund or surcharge period. This factor will be determined by dividing the amount of refund or surcharge allocated to each rate class by forecasted kilowatt-hour usage for the class during the period in which the refund or surcharge will be made.

      (6)      A petition to surcharge or refund a fuel under- or over-recovery balance not associated with a proceeding under subsection (d) of this section shall be processed in accordance with the filing schedules in §25.237(d) of this title (relating to Fuel factors) and the deadlines in §25.237(e) of this title.

(f)      **Procedural schedule.**  Upon the filing of a petition to reconcile fuel expenses in a separate proceeding, the presiding officer shall set a procedural schedule that will enable the commission to issue a final order in the proceeding within one year after a materially complete petition was filed. However, if the deadlines result in a number of electric utilities filing cases within 45 days of each other, the presiding officers shall schedule the cases in a manner to allow the commission to accommodate the workload of the cases irrespective of whether such procedural schedule enables the commission to issue a final order in each of the cases within one year after a materially complete petition is filed.

# APPENDIX B

# CHAPTER 25. SUBSTANTIVE RULES APPLICABLE TO ELECTRIC SERVICE PROVIDERS.

## Subchapter J. COSTS, RATES AND TARIFFS.

## DIVISION 1: RETAIL RATES.

### §25.237. Fuel Factors.

(a)   **Use and calculation of fuel factors.** An electric utility's fuel costs will be recovered from the electric utility's customers by the use of a fuel factor that will be charged for each kilowatt-hour (kWh) consumed by the customer.

    (1)   An electric utility may determine its fuel factor in dollars per kilowatt-hour pursuant to either subparagraph (A) or (B) of this paragraph. Fuel factors must account for system losses and for the difference in line losses corresponding to the voltage at which the electric service is provided. An electric utility may have different fuel factors for different times of the year to account for seasonal variations. A different method of calculation may be allowed upon a showing of good cause by the electric utility.

        (A)   Fuel factors may be determined by dividing the electric utility's projected net eligible fuel expenses, as defined in §25.236(a) of this title (relating to Recovery of Fuel Costs), by the corresponding projected kilowatt-hour sales for the period in which the fuel factors are expected to be in effect.

        (B)   Fuel factors may be determined using a commission-approved, utility-specific fuel factor formula. Fuel factor formulas may be approved or revised only in a general rate change proceeding or a proceeding to consider an application to establish a fuel factor formula with notice and an opportunity for a hearing.

    (2)   An electric utility may initiate a change to its fuel factor as follows:

        (A)   Pursuant to subsection (a)(1)(A) of this section, an electric utility may petition to adjust its fuel factor as often as once every four months according to the schedule set out in subsection (d) of this section.

        (B)   Pursuant to subsection (a)(1)(B) of this section, an electric utility may petition to adjust its fuel factor in accordance with its approved fuel factor formula no sooner than four months after the filing of its most recent fuel factor adjustment petition.

        (C)   Notwithstanding subsection (a)(2)(A) of this section, an electric utility may petition to change its fuel factor at times other than provided in the schedule if an emergency exists as described in subsection (f) of this section.

        (D)   An electric utility's fuel factor may be changed in any general rate proceeding.

    (3)   Fuel factors are temporary rates, and the electric utility's collection of revenues by fuel factors is subject to the following adjustments:

        (A)   The reasonableness of the fuel costs that an electric utility has incurred will be periodically reviewed in a reconciliation proceeding, as described in §25.236 of this title, and any disallowed costs resulting from a reconciliation proceeding will be reflected in the calculation of the utility's recoverable fuel and over/(under) collections.

        (B)   To the extent that there are variations between the fuel costs incurred and the revenues collected, it may be necessary or convenient to refund overcollections or surcharge undercollections. Refunds or surcharges may be made without changing an electric utility's fuel factor. Notwithstanding §25.236(e)(6) of this title, an electric utility may petition for a surcharge any time it has materially undercollected its fuel costs and projects that it will continue to be in a state of material undercollection. Notwithstanding §25.236(e)(6) of this title, an electric utility shall petition to make a refund any time it has materially overcollected its

**§25.237(a)(3)(B) continued**

fuel costs and projects that it will continue to be in a state of material overcollection. "Materially" or "material," as used in this section, shall mean that the cumulative amount of over- or under-recovery, including interest, is greater than or equal to 4.0% of the annual actual fuel cost figures on a rolling 12-month basis, as reflected in the utility's monthly fuel cost reports as filed by the utility with the commission.

(b)    **Petitions to revise fuel factors.**

(1)    An electric utility using the fuel factor methodology set forth under subsection (a)(1)(A) of this section may file a petition requesting revised fuel factors pursuant to subsection (a)(2)(A) of this section during the first five business days of the months specified in subsection (d) of this section. A copy of the complete petition package shall be served on each party in the utility's most recent fuel reconciliation and on the Office of Public Utility Counsel. Service shall be accomplished by email if possible. Each complete filing package shall include the commission-prescribed fuel factor application, a tariff sheet reflecting the proposed fuel factors and supporting testimony that includes the following information:

(A)    For each month of the period in which the fuel-factor has been in effect and has not been reconciled up to the most recent month for which information is available,

(i)    the revenues collected pursuant to fuel factors by customer class;

(ii)    any other items that to the knowledge of the electric utility have affected fuel factor revenues and eligible fuel expenses; and

(iii)    the difference, by customer class, between the revenues collected pursuant to fuel factors and the eligible fuel expenses incurred.

(B)    For each month of the period for which the revised fuel factors are expected to be in effect, provide system energy input and sales, accompanied by the calculations underlying any differentiation of fuel factors to account for differences in line losses corresponding to the voltage at which the electric service is provided.

(2)    An electric utility using the fuel factor formula methodology set forth under subsection (a)(1)(B) of this section may file a petition requesting revised fuel factors pursuant to subsection (a)(2)(B) of this section at least 15 days prior to the first billing cycle in the billing month in which the proposed fuel factors are requested to become effective. A copy of the complete petition package shall be served on each party in the utility's most recent fuel reconciliation and on the Office of Public Utility Counsel. Service shall be accomplished by email if possible. Each complete filing package shall include:

(A)    a tariff sheet reflecting the proposed fuel factors;

(B)    workpapers supporting the calculation of the revised fuel factors;

(C)    calculations underlying any differentiation of fuel factors to account for differences in line losses corresponding to the voltage at which the electric service is provided; and

(D)    any computer generated documents must be provided in their native electronic format with all cells and internal formulas disclosed.

**§25.237 continued**

(c)    **Fuel factor revision proceeding.**  Burden of proof and scope of proceeding are as follows:
  (1)    In a proceeding to revise fuel factors pursuant to subsection (a)(1)(A) of this section, an electric utility has the burden of proving that:
    (A)    the expenses proposed to be recovered through the fuel factors are reasonable estimates of the electric utility's eligible fuel expenses during the period that the fuel factors are expected to be in effect;
    (B)    the electric utility's estimated monthly kilowatt-hour system sales and off-system sales are reasonable estimates for the period that the fuel factors are expected to be in effect; and
    (C)    the proposed fuel factors are reasonably differentiated to account for line losses corresponding to the voltage at which the electric service is provided.
  (2)    The scope of a fuel factor revision proceeding under subsection (a)(1)(B) of this section is limited to the issue of whether the petitioning electric utility has appropriately calculated its proposed fuel factors.  In a proceeding to revise fuel factors pursuant to subsection (a)(1)(B) of this section, an electric utility has the burden of proving that:
    (A)    the electric utility has calculated its proposed fuel factors in compliance with the commission-approved fuel factor formula; and
    (B)    the proposed fuel factors utilize a commission-approved adjustment to account for line losses corresponding to the voltage at which the electric service is provided.

(d)    **Schedule for filing petitions to revise fuel factors**.  A petition to revise fuel factors or to initiate or revise a fuel factor formula may be filed with any general rate proceeding.
  (1)    Otherwise, except as provided by subsection (f) of this section which addresses emergencies, petitions by an electric utility to revise fuel factors pursuant to subsection (a)(1)(A) of this section may only be filed in accordance with the following schedule:
    (A)    February, June and October : El Paso Electric Company;
    (B)    March, July and November : Entergy Texas, Inc.;
    (C)    April, August and December : Southwestern Public Service Company;
    (D)    May, September and January : Southwestern Electric Power Company; and
    (E)    March, July and November : any other electric utility not named in this subsection that uses one or more fuel factors.
  (2)    Petitions by an electric utility to revise fuel factors pursuant to subsection (a)(1)(B) of this section may be filed in any month except December.

(e)    **Procedural schedules.**
  (1)    Upon the filing of a petition to revise fuel factors pursuant to subsection (a)(1)(A) of this section, the presiding officer shall set a procedural schedule that will enable the commission to issue a final order in the proceeding as follows:
    (A)    within 60 days after the petition was filed, if no hearing is requested within 30 days of the petition; and
    (B)    within 90 days after the petition was filed, if a hearing is requested within 30 days of the petition.  If a hearing is requested, the hearing will be held no earlier than the first business day after the 45th day after the application was filed.

**§25.237(e) continued**

(2)    Upon the filing of a petition to revise fuel factors pursuant to subsection (a)(1)(B) of this section, the presiding officer shall set a procedural schedule as follows:

(A)    the presiding officer shall issue an order approving the proposed fuel factors on an interim basis no later than 12 days after the date the petition was filed, if no objection to interim approval is filed within 10 days after the date the petition was filed;

(B)    if no hearing is requested within 30 days after the petition was filed, the presiding officer shall, after submission of proof of notice by the electric utility, issue an order approving the fuel factors without hearing or action by the commission; and

(C)    if a hearing is requested within 30 days after the petition was filed, the hearing will be held no earlier than the first business day after the 45th day after the petition was filed and a final order will be issued within 90 days after the petition was filed, subject to submission of proof of notice by the electric utility.

(f)    **Emergency revisions to the fuel factor.**  If fuel curtailments, equipment failure, strikes, embargoes, sanctions, or other reasonably unforeseeable circumstances have caused a material under-recovery of eligible fuel costs, the electric utility may file a petition with the commission requesting an emergency interim fuel factor.  Such emergency requests shall state the nature of the emergency, the magnitude of change in fuel costs resulting from the emergency circumstances, and other information required to support the emergency interim fuel factor.  The commission shall issue an interim order within 30 days after such petition is filed to establish an interim emergency fuel factor. If within 120 days after implementation, the emergency interim factor is found by the commission to have been excessive, the electric utility shall refund all excessive collections with interest calculated on the cumulative monthly ending under- or overrecovery balance in the manner and at the rate established by the commission for overbilling and underbilling in §25.28(c) and (d) of this title (relating to Bill Payment and Adjustments Billing).  If, after full investigation, the commission determines that no emergency condition existed, a penalty of up to 10% of such over-collections may also be imposed on investor-owned electric utilities.